[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I.
The petitioner, Norberto Rivera, pursuant to General Statutes § 52-466, article 1, section 8 of the Connecticut constitution, and amendments VI and XIV to the United States constitution, has filed a petition with this court for a writ of habeas corpus. In his petition, Rivera claims that he received ineffective assistance of counsel from his trial attorney Brian O'Connell and from his appellate attorney Richard S. Cramer. Rivera also claims that he is actually innocent. For the reasons set forth below, the petition is dismissed.
The petitioner was charged with "one count of murder in violation of General Statutes § 53a-54a(a), one count of criminal attempt to commit murder in violation of General Statutes §§ 53a-54a(a) and 53a-49(a)(2), and one count of CT Page 16771 assault in the first degree in violation of General Statutes § 53a-59(a)(1). . . . On July 13, 1990, a jury rendered a guilty verdict on all counts. The trial court [Miano, J.] sentenced the defendant to three terms of imprisonment: fifty years for the first count of murder; twenty years for the second count of attempted murder; and twenty years for the third count of assault in the first degree. The second and third counts were to run concurrently and both were to run consecutively with the first count for a total effective sentence of seventy years."State v. Rivera, 220 Conn. 408, 408-11, 599 A.2d 1060 (1991). Presently the petitioner is in the custody of the respondent serving the sentence imposed by the court.
The Supreme Court determined that the jury could have reasonably found the following facts: "Javier Mautino, the assault victim, is the brother of the defendant's former girlfriend, Maria Ortiz. After Ortiz ended their relationship in 1984, the defendant remained angry at her and blamed her family for interfering with their romance. On February 3, 1987, in a taped telephone conversation with Ortiz, the defendant threatened to kill her brother, Mautino. In June 1988, shortly before the incident underlying the defendant's conviction, the defendant placed several calls to Ortiz' sister, Sonia Fraser, telling her that he planned to kill Mautino.
"On the evening of July 1, 1988, Mautino and Fernando Fuentes, the murder victim, were at the Peruvian Club in Hartford. The defendant, who was also present, argued with Mautino and challenged him to a fight outside. Mautino declined and the defendant, calling him a coward, departed. When Mautino and Fuentes left shortly thereafter, the defendant who had remained outside the club, shot both men. Fuentes died from his wounds and Mautino, although surviving the assault, died from cancer before the trial." State v. Rivera, supra,220 Conn. 409-11.
The petitioner appealed his conviction to the Supreme Court of Connecticut which affirmed his conviction. Id. at 417. The petitioner was represented at trial by Attorney Brian M. O'Connell. On appeal, the petitioner was represented by Attorney Richard S. Cramer.
On May 20, 1992, the petitioner filed his petition for habeas corpus based on ineffective assistance of counsel. Then, with the assistance of Public Defender Todd Edgington, the petitioner, on CT Page 16772 October 8, 1996, filed an amended petition. On November 21, 1997, the petitioner filed a second amended petition which, with a second amended third count to the second amended petition filed on August 11, 1999, is before the court pursuant to State v.Leecan, 198 Conn. 517, 541-42, 504 A.2d 480, cert. denied,476 U.S. 1184, 106 S.Ct. 2922, 91 L.Ed.2d 550 (1986) (holding that the proper vehicle for raising an ineffective assistance of counsel claim is by a petition for a writ of habeas corpus). See also State v. Crespo, 246 Conn. 665, 718 A.2d 925 (1998); cert. denied ___ U.S. ___, 119 S.Ct. 911, 142 L.Ed.2d 909 (1999).
The petition alleges in the first count that O'Connell's assistance "fell below the range of competence displayed by lawyers with ordinary training and skill in criminal law; and there is a reasonable probability that but for O'Connell's failures, the outcomes of the proceedings would have been different as the petitioner suffered actual prejudice to his defense and he remains burdened by an unreliable conviction." (Second Amended Petition, Count 1, ¶ 9, p. 5.) Specifically, the petitioner makes numerous claims of O'Connell's alleged failures to cross-examine witnesses, adequately and effectively cross-examine witnesses,[1] adequately and effectively argue to the jury during summation, call witnesses, have evidence independently tested, investigate, and object to statement's made by the state's attorney. (Second Amended Petition, Count 1, ¶ 8, pp. 2-5.)[2] Many of the petitioner's claims focus on O'Connell's alleged failure to elicit and argue details of inconsistencies in the witnesses' testimony.
In the second count, the petition alleges that on appeal Attorney Cramer's assistance also fell below the standard of competence for criminal lawyers and that Cramer's alleged failures prejudiced the petitioner. (Second Amended Petition, Count 2, ¶ 9, p. 6.) More specifically, the petitioner claims that Attorney Cramer "failed to raise evidentiary and constitutional issues for review in the petitioner's direct appeal." (Second Amended Petition, Count 2, ¶ 8, p. 6.)
Finally, in count three, the petitioner alleges that he was "denied his state and federal constitutional rights to effective assistance of counsel and due process of law. . . . [and that he] is actually innocent." (Citations omitted.) (Second Amended Third Count to Second Amended Petition, Count 3, ¶ 8, p. 1.)
In connection with Rivera's petition for a writ of habeas CT Page 16773 corpus, a hearing was held before this court beginning on January 6, 1998 and continuing intermittently through November 20, 1998. Throughout the course of the hearing, several witnesses testified: Norberto Rivera, the petitioner; Attorney Brian M. O'Connell, trial counsel for the petitioner; Dr. Ira Kanfer; Hernan Viera; Donald Gates; John Bernetich; Det. William Gervais; Carlos Bonilla; Det. Michael Dakin; Robert Hathaway; Armando Salvador; Maria Ortiz; Det. Bruce Tischofer; Oswald Blint; Sgt. Ola Pollard; Off. Peter Hopkins; Det. Cruz Gonzales; Det. Gary Smith; Det. Peter Michaud; and Attorney Thomas Farver. The petitioner filed his post-trial brief on October 15, 1999.
 II.
In addition to the facts of the case as stated, supra, this court makes the following findings of fact from the hearing on the petition for a writ of habeas corpus. Throughout the course of the habeas hearing, O'Connell generally agreed that he had access to the materials necessary to cross-examine Mautino and there appears to be no substantial argument regarding O'Connell's investigation. (See Note 1, supra.) The petitioner's main contention is that O'Connell should have used the materials that were available to impeach Mautino during cross-examination and also that O'Connell should have used the materials in his summation to the jury. Throughout the habeas hearing, O'Connell had very little independent recollection of the details of his representation of Rivera. It was often necessary for O'Connell to consult his trial notes and transcripts of the probable cause hearing and the video deposition of Mautino in order to refresh his recollection. The only substantive aspect of the criminal trial about which O'Connell had an independent recollection was his general theory of defense. However, this lack of recollection with respect to the details of a trial, that had taken place eight years earlier, was not surprising.
During the habeas hearing, O'Connell was questioned extensively about his criminal trial experience before being assigned by his firm to handle Rivera's case. (Rivera v. Warden, Transcript, Jan. 7, 1998, pp. 5-20 (hereinafter Transcript II).) O'Connell testified that Rivera's was his murder trial as lead counsel. (Transcript II, p. 20.) O'Connell had worked as lead counsel in one or two prior trials that went to verdict; those cases involved a mixture of misdemeanors and felonies with exposure to possible jail time of ten years or more. (Transcript II, pp. 14-16.) O'Connell also had worked as lead counsel in CT Page 16774 about fifteen cases that settled before a verdict and sat as second chair in about twenty cases, some of which involved murder charges. (Transcript II, pp. 17-20.) During the course of the criminal trial, O'Connell received assistance from other, more experienced attorneys in his firm, some of whom were present in the courtroom during various stages of the trial. (Transcript II, pp. 20-25.)
Mautino, the surviving victim of the shooting, contracted stomach cancer prior to trial. His condition worsened as the cancer spread to his bones, liver, and other organs. Due to his possible unavailability for trial, his video deposition was taken. (Resp. Ex. O.; Pet. Ex. 3, p. 74, et seq.) O'Connell represented the petitioner at that deposition and cross-examined Mautino. Mautino died before the trial commenced. At the deposition, Mautino testified that on the night of the shootings he consumed "maybe nine, maybe ten, maybe more, maybe less" beers. (Pet. Ex. 3, p. 155.) Earlier, at the probable cause hearing, Mautino gave similar testimony saying that he had consumed six or eight twelve ounce Budweiser beers. (Pet. Ex. 1, p. 46-47.) When asked in what amount of time he had consumed those six to eight beers, Mautino replied that he had done so from the time he and Fuentes arrived at Club Peru until the time of the incident. (Pet. Ex. 1, p. 47.)
Regarding the video-taped deposition, the jury could reasonably have found Mautino's testimony to be credible and compelling. During the deposition, Mautino appeared to be in obvious pain and discomfort, indicated not only by his facial expressions and frequent shifting in his chair, but also by his testimony that he was constantly in pain because of the cancer that had spread through many of his vital organs and throughout his body. (Pet. Ex. 3, pp. 79-84.) Mautino testified that his illness was terminal (Pet. Ex. 3, pp. 82-83) and, in fact, he died before the trial began. (Pet. Ex. 3, p. 74.) Mautino's deposition was admitted at trial. (Pet. Ex. 3, p. 74.)
With respect to the substance of Mautino's testimony, the jury could have reasonably found the following facts. Rivera was within five or six feet of Mautino, who was by that point lying on the ground, when Rivera fired the last two or three shots; therefore, Mautino would have had a very close view of the shooter. (Pet. Ex. 3, pp. 138-141.) Not only did Mautino testify that he saw Rivera shoot him, he also testified that he heard Rivera's voice as Rivera made statements during the shooting such CT Page 16775 as "So there are two of you, so there is two for one" (Pet. Ex. 3, p. 134); "Now, everybody knew who T.J. was" (Pet. Ex. 3, p. 139); "I am going to kill you." (Pet. Ex. 3, p. 139.) In addition to his testimony at the probable cause hearing and at the deposition, Mautino identified Rivera as the shooter on a number of different occasions: to a police officer at the scene of the shootings at approximately the time that Mautino was put into an ambulance (Pet. Ex. 3, pp. 143-44); at the hospital where Mautino told his brother, Armando Salvatore, that T.J. [Rivera] shot Mautino and that Armando would have to tell the police because Mautino "did not know whether he was going to make it." (Pet. Ex. 3, p. 144); at the hospital on the following afternoon in a statement to Detective Dakin (Pet. Ex. 12, p. 2); again at the hospital, in a statement to Detective Dakin on July 6, 1988, approximately 5 days after the shooting (Pet. Ex. 13); again to Detective Dakin on July 8, 1988 (Pet. Ex. 14); and again to Detective Dakin on September 2, 1988 at the Crimes Against Persons Division. (Pet. Ex. 15.) Finally, although Mautino was not clear about many of the details of the events prior to the shootings or about the details of the shootings themselves, as he recounted them during the deposition, he admitted as much and never deviated substantially from the substance of his version of the events.
Also during the habeas hearing, Rivera testified as to his version of the events that took place on the night of the shootings. (Rivera v. Warden, Transcript, Mar. 4, 1998 (hereinafter Transcript VIII); Rivera v. Warden, Transcript, Mar. 6, 1998 (hereinafter Transcript IX); Pet. Brief, pp. 16-27.) During the cross-examination, Rivera was evasive in many of his responses and often answered initial questions, but then declined to give more detail to follow up questions. For instance, Rivera testified that he told a senior partner in O'Connell's firm that he did not want to be represented by O'Connell; but, in response to another question, Rivera claimed that he did not remember what his reason was for not wanting O'Connell as his attorney. (Transcript IX, p. 55.) Later on, however, Rivera did give a reason (after again testifying that he could not remember) for why he didn't want O'Connell to represent him, namely, that during one visit at the jail, it appeared to him that O'Connell was drunk. (Transcript IX, p. 77-78.) Therefore, this court finds that Rivera's testimony, based on these inconsistencies as well as other factors, was less than credible and that his explanation of the events surrounding the shootings is unpersuasive. CT Page 16776
At the habeas hearing, the petitioner called Attorney Thomas Farver to testify as an expert on criminal trials. (Transcript VIII, pp. 49, et seq.) In attempting to elicit Farver's opinion as to the standard of competence for a criminal defense attorney, the petitioner's attorney posed a number of hypothetical fact patterns. The first hypothetical about which Farver was asked was significantly different than the facts in the present case in that the hypothetical includes the assumption that the victim indicated that there was a street fight. (Transcript VIII, pp. 57-58.) Farver gave an opinion that an attorney's failure to address the inconsistencies, in such a hypothetical situation, fails to meet the required standard of competence. (Transcript VIII, pp. 58-59.) This opinion, however, is of very little value in the present case because, as explained, in section IVA(1)(a),infra, Mautino never testified nor gave a statement indicating that there was a fight. Therefore, any opinions given by Farver based on the original assumptions of the first hypothetical are inaccurate as applied to the facts of the present case. Farver even admitted that his opinions are only accurate as to the facts of the hypothetical given to him. (See Transcript VIII, p. 100.)
Next, to the extent that Farver gave testimony without having read the testimony of certain witnesses, his opinions can be discounted. For example, Farver testified that because of O'Connell's failure to cross examine on certain inconsistencies, those inconsistencies were left unchallenged. (Transcript VIII, pp. 86-87.) The inconsistencies, however, were challenged by O'Connell through the testimony of the defense witnesses who recounted different facts than the victim. Without having read the defense witness' testimony (Transcript VIII, pp. 95-98), Farver could not possibly have formed a proper opinion as to whether O'Connell's attempt to impeach Mautino met the required standard of competence. In any case, Farver testified that one way to impeach a witness' testimony is to bring in other witnesses whose testimony contradicts with what the first witness said. (Transcript VIII, pp. 97-98.) Also, Farver testified that he read the transcript of Mautino's trial testimony but did not view the videotape of that testimony. (Resp. Ex. O). Farver's opinion with respect to how a reasonably competent defense attorney would approach cross examination of a witness, such as Mautino, may have been drastically altered after such a viewing.
Finally, when called to testify during the habeas hearing, Hernan Viera, the person whom the petitioner alleges was the shooter, asserted his Fifth Amendment rights and chose not to CT Page 16777 answer any substantive questions. (Transcript V, pp. 16-35.)
 III.
In a habeas corpus proceeding the burden of establishing grounds for relief rests with the petitioner. Biggs v. Warden,26 Conn. App. 52, 55, 597 A.2d 839 (1991), cert. denied,221 Conn. 902, 600 A.2d 1029 (1991). The proper method for asserting a claim of ineffective assistance of counsel is by way of a motion for a writ of habeas corpus. State v. Leecan, supra,198 Conn. 541-42; Lozada v. Warden, 223 Conn. 834,613 A.2d 818 (1992). Connecticut follows the two-pronged test for evaluating the performance of trial counsel found in Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Nievesv. Commissioner, 51 Conn. App. 615, 724 A.2d 508 (1999), cert. denied 248 Conn. 905, 731 A.2d 309 (1999). "[T]he defendant must establish not only that his counsel's performance was deficient, but that as a result thereof he suffered actual prejudice, namely, that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." (Emphasis added.) Nieves v.Commissioner, supra, 51 Conn. App. 620. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown of the adversary process that renders the result unreliable." Fair v. Warden, 211 Conn. 398, 402,559 A.2d 1094 (1989), cert. denied, 493 U.S. 981, 110 S.Ct. 512,108 L.Ed.2d 574 (1989). Stated another way, the "petitioner must make a two-fold showing: (1) that his counsel's performance fell below the required standard of reasonable competence or competence displayed by lawyers with ordinary training and skill in the criminal law; and (2) that this lack of competency contributed so significantly to his conviction as to have deprived him of a fair trial." (Citations omitted.) Valeriano v. Bronson, 209 Conn. 75,85-86, 546 A.2d 1380 (1988); accord Mozell v. Commissioner,51 Conn. App. 818, 820, 725 A.2d 971 (1999).
"In reviewing the claim, this court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under these circumstances, the challenged action might be considered sound trial strategy. In assessing the petitioner's claim, this court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, CT Page 16778 and to evaluate the conduct from counsel's perspective at the time." (Citations omitted; internal quotations omitted.) Magnottiv. Meachum, 22 Conn. App. 669, 674-675, 579 A.2d 553 (1990). "[I]t is perfectly consistent for even a lawyer who commits a grievous error — whether due to negligence or ignorance — to be deemed to have provided competent representation." Wainwright v.Sykes, 433 U.S. 72, 105, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), cited in Valeriano v. Bronson, supra, 209 Conn. 87. "Representation is an art and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense."Strickland v. Washington, supra, 466 U.S. 693. The standard of representation required is not perfection. See Copas v.Commissioner, 234 Conn. 139, 153-58, 662 A.2d 718 (1995).
In order to prevail on a freestanding claim of actual innocence, the petitioner must meet the following standard of proof: "First, taking into account both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing, the petitioner must persuade the habeas court by clear and convincing evidence, as that standard is properly understood and applied in the context of such a claim, that the petitioner is actually innocent of the crime of which he stands convicted. Second, the petitioner must establish that, after considering all of th[e] evidence and the inferences drawn therefrom . . . no reasonable fact finder would find the petitioner guilty." Miller v. Commissioner, 242 Conn. 745, 791-92, 700 A.2d 1108 (1997). The court must take into account and balance the various interests at stake, namely, the risk of an innocent person being incarcerated versus the risk of setting a guilty person free. Summerville v. Warden, 229 Conn. 397, 423,641 A.2d 1356 (1994); see also Miller v. Commissioner, supra,242 Conn. 792-803.
 IV. A. Count 1 — Ineffective Assistance of Trial Counsel
In count 1 of his petition, Rivera alleges that O'Connell rendered ineffective assistance of counsel during petitioner's trial. (Second Amended Petition, Count 1, ¶¶ 7-8, p. 2-5.)
 (1) O'Connell's Alleged Failure to Impeach Mautino CT Page 16779
In his post-trial brief, the petitioner claims that O'Connell's alleged failures to impeach Mautino through cross-examination and to address the alleged inconsistencies to the jury, constituted ineffective assistance of counsel, thus denying Rivera his state and constitutional rights. (Pet. Brief, p. 46). The petitioner claims that O'Connell's failure to impeach was unreasonable and failed to meet the required standards of skill and training of competent criminal attorneys and that Rivera was thereby prejudiced. (Pet. Brief, p. 46.) The grounds for impeachment cited to by the petitioner include twelve situations involving allegedly inconsistent statements made by Mautino. An analysis of each situation follows.
 (a) Whether there was an Agreement to Fight and Whether there was a Fight
The petitioner points to alleged inconsistencies in Mautino's testimony about whether or not there was a fight on Francis Avenue prior to the shooting. (Pet. Brief, p. 49.) This apparent inconsistency breaks down into two parts: (1) whether Mautino agreed to go outside to fight with Rivera, and (2) whether there was actually a fight. These are two of the substantive differences in the versions told by Rivera and Mautino. Rivera's claim is that Mautino invited Rivera to fight, that Rivera accepted Mautino's offer, and that there was indeed a fist fight on Francis Avenue. (Pet. Brief. pp. 16-23.) Mautino has apparently given differing statements regarding whether he agreed to fight, see infra, but he has never testified that he did in fact fight Rivera on the street.
Detective Dakin's first report of the incident, made roughly sixteen hours after the shootings, indicates that due to the second confrontation between Rivera and Mautino in the club, Mautino "became angered and complied" with Rivera's invitation to go outside to fight. (Pet. Ex. 12, p. 1.) Upon being re-interviewed by Dakin, Mautino indicated "that previous to going outside to fight, T.J. [Rivera] went outside and returned, then they proceeded to take there [sic] differences outside." (Pet. Ex. 14.) However, at the probable cause hearing, on direct examination, Mautino testified that he declined Rivera's invitation to go outside and fight. (Pet. Ex. 1, pp. 31-33.) Also, Mautino's deposition testimony indicates that Mautino refused to go outside to fight with Rivera. (Pet. Ex. 3, pp. 124-26, 181-87.)[3]
CT Page 16780
A reasonably competent defense attorney would have addressed this inconsistency because it goes to Mautino's credibility as a witness in relating the relevant events. Moreover, the inconsistency goes to whose story was more truthful. O'Connell did not cross-examine Mautino on this inconsistency, nor did O'Connell address this inconsistency in his summation to the jury. (Transcript V, p. 77.) O'Connell, in order to meet the standard of reasonable competence, should have addressed this inconsistency.
The question then is whether or not O'Connell's failure in this regard prejudiced the petitioner. The court finds that it did not. Had O'Connell cross-examined Mautino regarding this inconsistency, there were many possible explanations that would have resulted in the statements having minor value for impeachment purposes. The jury may have concluded that Detective Dakin simply misunderstood Mautino when making the reports. The first report was made in the hospital just hours after the shooting and the other six days later. The detective might have misheard Mautino's statements regarding Rivera's invitation to fight and assumed that the reason they ended up on the street together was because there was an agreement to fight.[4] A reasonable jury in considering the reports might well have chosen to believe Mautino's under-oath testimony rather than the second-hand police reports. This is distinctly possible considering Mautino's condition at the hospital after having consumed a significant amount of alcohol and having been shot numerous times. In any event this discrepancy is minor in light of the entire testimony of Mautino and the strength of the state's case. The court finds that the petitioner has failed to sustain his burden of proving that he was prejudiced thus undermining the fairness of the trial.
As to whether there actually was a fight on the street prior to the shooting, Mautino testified during O'Connell's cross examination at the deposition, that both the second and third confrontations inside the club involved some pushing. (Pet. Ex. 3, pp. 181-82.) However, Mautino's testimony at both the probable cause hearing (Pet. Ex. 1, p. 49.) and the deposition made no reference to any fight outside the club before the shooting started. In fact, at the probable cause hearing on cross-examination, Mautino was asked, "Did you ever tell investigators from the Police Department that you had a fight outside?" (Pet. Ex. 1, p. 49.) Mautino answered, "No." (Pet. Ex. CT Page 16781 1, p. 49.) Therefore, there is no inconsistency in any of Mautino's testimony or statements regarding an actual fight.[5]
 (b) Whether Two Puerto Rican Males were Involved in the Shootings
According to police reports, Mautino stated that "two Puerto Rican men shot him," (Pet. Ex. 18) and that "he definitely [sic] recall[ed] a shorter hispanic male present with Norberto" (Pet. Ex. 15). Detective Dakin's report of July 2, 1988, records that at the time Mautino walked across the street, he "saw a short, mediu[m] to heavy hispanic male with short hair standing on the east side of the street, and a hispanic guy and girl also standing several feet from this other hispanic male. As he walked across the street, past T.J. he heard a single gunshot. After hearing this shot, he saw his friend, Fernando fall to the ground and T.J. standing there, with what appeared to be a rifle . . . ." (Pet. Ex. 12, pp. 1-2.)
In other reports, Mautino made no mention of a second man near Rivera. (Pet. Ex. 13; Pet. Ex. 14.) Also, there appears to have been no mention at the probable cause hearing of a second man standing next to Rivera. (Pet. Ex. 1, pp. 49-51.) At the deposition, Mautino stated that on the street, Rivera "was by himself." (Pet. Ex. 3, p. 192.) However, Mautino also explained that there were other people outside the club and Mautino stated "I saw — later, after everything happened, I thought I had seen someone standing there, but I could not see who it was." (Pet. Ex. 3, p. 192.) Nevertheless, Mautino answered affirmatively when asked if "throughout the entire episode, from the time the first shot was fired until the time that the car drove off . . . Mister Rivera was alone?" (Pet. Ex 3. p. 193).
A reasonably competent criminal defense attorney might have cross-examined Mautino on these inconsistencies and emphasized them in the summation to the jury.[6] The differences in the testimony, however, might be explained by finding that Mautino simply gave more detail in some statements than in others. Because, however, this court finds that the petitioner was not prejudiced by O'Connell's omission, there is no need to decide whether or not O'Connell "performance fell below the required standard of reasonable competence." Valeriano v. Bronson, supra209 Conn. 85-86; see also Nardini v. Manson, 207 Conn. 118, 124,540 A.2d 69 (1988) ("A court deciding an ineffective assistance of counsel claim need not address the question of counsel's CT Page 16782 performance, if it is easier to dispose of the claim on the ground of insufficient prejudice.") Regardless of whether there was a second man present on the street with Rivera (Mautino was not clear on this issue), Mautino consistently testified that Rivera is the person who shot Mautino and Fuentes. Had Mautino expressed any doubt as to who pulled the trigger, a jury may have found the inconsistency (regarding how many Puerto Rican men were present) relevant to the question of who the shooter was. Mautino, however, expressed no doubt. This is why, as explained below, O'Connell found it imperative to focus on Mautino's enmity towards Rivera rather than concentrating on details of Mautino's testimony.
 (c) Location of Mautino's car on Francis Avenue
The petitioner alleges that "while Atty. O'Connell allowed Mautino to place his client near a car that was, in fact, at least 145 feet south of where the shooting actually took place, Atty. O'Connell failed to point this fact to the jury." (Pet. Brief, pp. 11-12.) This alleged inconsistency is drawn from the difference in the location of Mautino's car, as described by Detective Michaud, compared to Mautino's statements that Rivera started shooting while standing near Mautino's car, which was near a light pole. (Pet. Ex. 1, pp. 34-35; Pet. Ex. 3, pp. 130-33; Pet. Ex. 23.)[7]
In the probable cause hearing, Mautino testified that on the night of the shootings he and Fuentes "were intending to go across the street to get to [Mautino's] car." (Pet. Ex. 1, p. 34.) Because of people coming into the club and the fact that cars were parked bumper to bumper, Mautino explained that he turned north to walk around the parked cars. (Pet. Ex. 1, p. 34.) At the deposition, Mautino also testified that his "car was across the street, and very near a light pole." (Pet. Ex. 3, p. 130; see also Pet. Ex. 3, pp. 130-33, 188-90.) Mautino testified further that as he left the club, he turned right (north), in order to avoid the people coming into the club, and then walked to the other side of two parked cars in order to cross the street. (Pet. Ex. 3, pp. 130-33.) Mautino explained further that "I must have been looking for my keys or something for my cars, and when I walked — a car went by and I lift my head up and I saw very near my car, Norberto. And he shot me. I saw the flare, you know, the light . . . ." (Pet. Ex. 3, pp. 132-33.)
O'Connell should have pointed out this inconsistency. Mautino CT Page 16783 may have readily explained it away by admitting that he forgot which light pole he parked his car near. Nevertheless, O'Connell should have probed this inconsistency. However the petitioner cannot meet his burden of establishing prejudice by a fair preponderance of the evidence so that it throws into question the underlying fairness of the trial.
 (d) Lighting Conditions on Francis Avenue
At the probable cause hearing, Mautino testified regarding the lighting on Francis Avenue at the time of the shootings: "It was fair. It wasn't dark." (Pet. Ex. 1, p. 37.) Mautino was consistent in his testimony at the deposition when he explained that between the street light and the neon light from the club, there was enough light to identify Rivera as the shooter.[8]
(Pet. Ex. 3, pp. 142-43.) Officer Tischofer, on the other hand, testified that because "it was really dark," it was difficult to see the spent shell casings. (Pet. Ex. 2, pp. 116-17.) Also, Detective Michaud testified that he called in the fire department to provide extra light during the investigation. (Pet. Ex. 2, pp. 33, 60.)
The reasons that justify O'Connell's decision not to focus on these inconsistencies are obvious. First, the lighting required to investigate a crime scene, which includes searching for spent shell casings, is much different than the lighting required for a victim to identify a shooter who was standing just a few feet from the victim, who was talking to the victim, and who identified himself as "T.J." Also, the witnesses who O'Connell chose to put on the stand were standing even further away from the gunman during the shooting than was Mautino, who testified that the last shots were fired at point blank range. The difference in distances would be a disincentive for O'Connell to elicit details of the lighting. In fact, had O'Connell pursued this course of cross-examination and arguments to the jury that the petitioner suggests, O'Connell might have hurt Rivera's case more than helped it. The jury would have likely concluded that in poor lighting, the closer witness, Mautino, would have had a superior vantage point to that of the defense's witnesses who were further away from the shooter. Therefore, it was not unreasonable for O'Connell to chose not to cross-examine or argue to the jury about these minor inconsistencies. In fact, this issue about the lighting conditions calls out for O'Connell not to cross-examine. CT Page 16784
 (e) Mautino's Knowledge of Rivera
At the probable cause hearing, Mautino stated that he did not know Rivera's last name at the time of the shooting. (Pet. Ex. 1, p. 36.) However, Detective Dakin's July 2, 1988 report, made from an interview with Mautino at 4:30 PM (roughly sixteen hours after the shooting), indicates that Mautino told the detective that T.J. Rivera was the shooter. (Pet. Ex. 12, pp. 1-2.) Dakin's report also explained that, while at the hospital, Mautino chose a picture of Rivera out of a pre-constructed photo array. (Pet. Ex. 12, p. 2.) The petitioner argues that without knowing Rivera's name, Mautino could not have given the police enough information for the police to include Rivera's picture in the array. This reasoning is unpersuasive because Mautino could have been reminded of Rivera's last name by relatives who visited Mautino at the hospital before Detective Dakin made his report. Furthermore, the police could have easily obtained Rivera's name from any of the other witnesses at the club or on the street.[9] The petitioner has failed to show that Mautino's statements are inconsistent and therefore they lack any impeachment value.
Again, O'Connell was reasonably competent in his choice not to concentrate on these alleged inconsistencies. O'Connell believed that had he questioned Mautino about the alleged inconsistencies Mautino could have explained his statements thereby bolstering his credibility. O'Connell chose instead to focus on Mautino's alleged animosity towards Rivera. In this context, O'Connell's performance cannot be said to have been below the standard of a reasonably competent attorney.
 (f) Mautino's Knowledge of Rivera's Relationship with Ms. Ortiz
Next, the petitioner points out that Mautino testified at the probable cause hearing that "he had no knowledge of the relationship between his sister, Ms. Ortiz, and Rivera." (Pet. Brief, p. 53.) The petitioner also alleges that Mautino's deposition testimony somehow indicates that Mautino knew nothing of Rivera's relationship with Ms. Ortiz up until the time of the shooting. (Pet. Brief, p. 53.) The petitioner alleges that Mautino's testimony from the probable cause hearing and deposition contradict what Mautino told Detective Dakin. (Pet. Brief, p. 53.) These allegations of the petitioner misrepresents Mautino' s testimony. At the probable cause hearing, Mautino testified that he found out about Ortiz' relationship with Rivera CT Page 16785 "[a]fter they broke up. " (Pet. Ex. 1, p. 41.) Furthermore, Mautino's testimony at the deposition indicates that he knew of Ortiz' relationship with Rivera when he was at the club on the night of the shootings, but it does not indicate how much earlier he knew. (Pet. Ex. 3, 157-58.) Because these statements, when read in proper context, are not inconsistent, there was no reason for O'Connell to cross examine or argue to the jury about these alleged inconsistencies.
 (g) Other Inconsistencies
There are other inconsistencies, pointed to by the petitioner, that can best be discussed together. First, the petitioner argues that Mautino's testimony at the probable cause hearing on October 6, 1988 (Pet. Ex. 1, p. 53) regarding the location from which the weapon was produced differed from the statement given to police on July 8, 1988, as recorded by Detective Michael Dakin (Pet. Ex. 14). (Pet. Brief p. 14.) At the probable cause hearing, Mautino testified that Rivera produced the weapon from "[t]he sleeve in the coat that he was wearing." (Pet. Ex. 1, p. 53.) The detective's report indicates that Mautino told the officer that "T.J. [Rivera] took the weapon from his waistband . . . ." (Pet. Ex. 14.)
Next, the petitioner alleges that Mautino's testimony regarding the number of confrontations in the club is inconsistent. (Pet. Brief, p. 49.) At the probable cause hearing, Mautino testified about two confrontations in the club. (Pet. Ex. 1, pp. 31-33.) At the videotaped deposition on May 2, 1990, Mautino testified about three confrontations in the club. (Pet. Ex. 3, pp. 123-26.)
Another inconsistency, according to the petitioner, is the sequence of the shootings. According to some police reports, Mautino stated that Rivera shot Fuentes first and then shot Mautino. (Pet. Ex. 12, pp. 1-2; Pet. Ex. 13.) According to another police report made on September 2, 1988 (Pet. Ex. 15), Mautino's testimony at the probable cause hearing (Pet. Ex. 1, pp. 35-36), and Mautino's testimony at the deposition (Pet. Ex. 3, pp. 132-35), Rivera shot Mautino first, then Fuentes, and then Mautino again.
Yet another inconsistency, according to the petitioner, involves statements given by Mautino regarding why Mautino and Fuentes left the club. During the probable cause hearing, Mautino CT Page 16786 was not asked specifically and did not give a specific reason for his leaving the club. (Pet. Ex. 1, p. 33.) At the deposition, Mautino was asked on direct and on cross-examination why he left the club and he answered that he and Fuentes left because there was a long wait to get onto a pool table. (Pet. Ex. 3, pp. 127, 187.)
With respect to Mautino and Rivera leaving the club, the petitioner also alleges another inconsistency. During the probable cause hearing, Mautino testified about the narrow staircase going down from the second floor club towards the exit of the building. (Pet. Ex. 1, pp. 33-34.) Mautino testified that "[t]here weren't people coming up when we were going down." (Pet. Ex. 1, p. 34.) At the deposition, however, Mautino testified that he and Fuentes encountered some acquaintances of Fuentes before descending the stairway and that "there was [sic] people coming up the steps . . . so Fernando [Fuentes] got behind me." (Pet. Ex. 3, p. 130.)
Finally, the petitioner alleges that Mautino was inconsistent in his testimony about whether or not Fuentes hit his head on a parked car when falling after being shot. (Pet. Brief, p. 53.) In Detective Dakin's first three reports, there is no indication that Mautino stated whether or not Fuentes struck his head on a car. However, in his report dated September 2, 1988, Detective Dakin indicated that Mautino stated that Fuentes hit his head on a parked car while falling to the ground. (Pet. Ex. 15.)
These alleged failures of counsel, whether taken individually or collectively, are not sufficient to sustain the petitioner's burden to demonstrate that trial counsel was ineffective by a fair preponderance of the evidence. For instance, producing a gun from a sleeve or waistband might look very much the same and it is difficult for this court to imagine that it matters. O'Connell testified at the habeas hearing that it was his opinion that to have dwelt on such a slight inconsistency could have been very damaging to his client's case because it would associate Rivera with the gun, something O'Connell was trying to avoid. (Transcript V, pp. 60-66.) Also, at the time the gun was drawn, Mautino was further away from Rivera than at any other time during the shootings.
Similar reasoning can be used for the other alleged inconsistencies. In some of the situations, there is simply no real inconsistency; in others there is merely a difference in the CT Page 16787 amount of detail that was elicited from Mautino. Also, in light of the fact that Mautino had consumed roughly ten beers during the evening of the shooting it is understandable that Mautino would confuse or forget certain details.[10] Another factor that would explain the inconsistencies is the fact that numerous confrontations took place throughout the course of the evening, undoubtably causing tempers and emotions to flare. Moreover, the fact that numerous shots were fired amidst a crowd of people would clearly explain some inconsistent recollection of what exactly took place in the resulting confusion.
Considering all of these factors, there is no obvious reason why O'Connell should have cross-examined on these issues or addressed them to the jury. Some of the claimed inconsistencies are simply trivial. Furthermore, as O'Connell indicated, there was a fear that concentrating on the details would allow Mautino to "continuously reiterate that [Rivera] was responsible for the shooting." (Transcript V, pp. 88-89.) Also, a reasonable jury could have chosen to believe Mautino's live, under-oath testimony rather than the police reports.[11]
In sum, O'Connell ought to have addressed any relevant inconsistency in Mautino's statements during the trial. However, it is important to remember that what matters is the impact and import of the inconsistencies. O'Connell reached the reasonable conclusion that the risks of pointing out certain inconsistencies outweighed the benefits that the defense might gain. (Transcript V, pp. 58-67.) Furthermore, even if O'Connell's decision not to cross-examine on these various inconsistencies constituted a deficient performance, the court finds that the petitioner suffered no prejudice because of the performance. The inconsistencies, even if brought out, simply would not have undermined the strength of the state's case.
The twelve alleged failures of O'Connell to impeach, either through cross-examination or through arguments to the jury during summation, whether viewed individually or collectively do not constitute ineffective assistance of counsel as the standard has been established by our courts.[12] Under the two-pronged test of Strickland v. Washington, O'Connell's performance was not deficient, except for those situations as noted above, and in no respect did any deficiency, individually or collectively, cause Rivera to suffer actual prejudice. In sum, this court finds that O'Connell's representation of Rivera was not constitutionally ineffective based on the twelve alleged failures. Furthermore, CT Page 16788 O'Connell's decision not to cross-examine on, or include in his jury summation, the inconsistencies pointed to by petitioner is further justified by O'Connell's theory of the case as discussed in the next section.
 (2) O'Connell's Defense Theory and Alleged Failure to Present a Complementary Defense
The petitioner also claims in his post-trial brief that O'Connell's defense theory of fabrication does not excuse his alleged failure to present a complementary defense theory. (Petitioner's Brief, p. 64). O'Connell, during the habeas hearing, repeatedly testified that it was his theory that Rivera's best defense would be one that focused on Mautino's alleged hatred for Rivera as well the theory that Hernan Viera was the gunman. (Transcript II, pp. 44-47; Rivera v. Warden, Transcript, Jan. 9, 1998, p. 29-34 (hereinafter Transcript IV); Transcript V, pp. 36-37, 45-48, 55-67, 77-79, 90-91; Rivera v.Warden, Transcript, Jan. 14, 1998, p. 19-22, 28-32, 56-63 (hereinafter Transcript VI).) "The theory of my case, the strategy which I was pursuing was a strategy which focused upon the motives of Mautino and the supporting — and his supporting witnesses, which were generally members of his family to fabricate a story or an accusation against my client. I believe that this was the most rational, this would provide the most rational and reasonable theory of innocence that was possible and that that would be the main focus in my opinion based upon my assessment of the impact of the state's witnesses, the condition and impact . . . the condition meaning the physical condition of Mr. Mautino, his appearance in front of a camera, which was the way that he was presented obviously to the jury, the testimony of his witnesses . . . ." (Transcript IV, p. 29.)
In order to present his defense of Rivera, O'Connell called several witnesses who testified that Rivera was the fighter not the shooter and that a taller individual was the shooter. This was O'Connell's attempt to impeach the credibility of Mautino's testimony, rather than badgering a witness who was also the victim and who was dying and obviously in discomfort.[13] Also, in light of the history between Mautino and Rivera, especially the facts regarding the relationship between Rivera and Ortiz (Mautino's sister), it was certainly reasonable for O'Connell to attempt to present a clear theory of the case that focused on Mautino's alleged hatred for Rivera. From the outcome of the CT Page 16789 trial, it is apparent that the jury did not find the defense witness' testimony credible enough to overcome Mautino's testimony. Nevertheless, O'Connell's theory to focus on Mautino's animosity towards Rivera while avoiding confusing details was sound and cannot be second guessed merely because Rivera was convicted. Furthermore, there is no reason to hold that O'Connell should have argued in the alternative to the jury, despite the petitioner's suggestion that he should have done just that. Such a strategy is inherently risky; a competent criminal defense attorney would normally avoid making alternative arguments to a jury.
The petitioner's best argument seems to be this: O'Connell could have bolstered his case by arguing that (in addition to O'Connell's theory that Mautino named Rivera as the shooter because Mautino hated Rivera for what Rivera had done to Mautino's sister) many of Mautino's statements, (esp. those about there being two Puerto Rican males; whether there was a fight; and the location of the cars, light pole, and shooter) are inconsistent and seem to point to the possibility that perhaps someone else was the shooter. These inconsistencies actually support the other eye witnesses' testimony. Nevertheless, the petitioner has failed to sustain his burden of proving that O'Connell's performance with respect to these alleged inconsistencies was unreasonable "under prevailing professional norms," Strickland v. Washington, supra 466, U.S. 688, and caused the petitioner actual prejudice.
In conclusion, faced with a sympathetic victim who testified that he was shot at very close range by a defendant who the victim knew, and who had often threatened to kill the victim, defense counsel devised a strategy that was reasonable. His thorough case investigation led him to witnesses who supported the defense theory that the petitioner was not the shooter and defense counsel offered an explanation as to why the victim might lie about the events. The case revolved around credibility and the jury chose to believe the victim. While other tactics and strategies might have been employed and while defense counsel could have taken advantage of certain opportunities to impeach the victim's testimony, defense counsel attempted to do so, for the most part, through the use of other witnesses. O'Connell's representation fell within the broad range of competence as that standard has been established by Strickland v. Washington and its progeny. CT Page 16790
 B. Count 2 — Ineffective Assistance of Appellate Counsel
In his second amended petition, the petitioner alleged that his appellate counsel, Attorney Cramer, rendered ineffective assistance of counsel. (Second Amended Petition, Count 2, ¶¶ 1-11, pp. 5-6.) Because the petitioner did not address this count in his post-trial brief, it is considered waived pursuant to Practice Book § 5-2 and will, therefore, not be addressed by this court.
 C. Count 3 — Actual Innocence
Finally, in count three, the petitioner alleges that he was "denied his state and federal constitutional rights to effective assistance of counsel and due process of law. . . . [and that he] is actually innocent." (Citations omitted.) (Second Amended Third Count to Second Amended Petition, Count 3, ¶ 8, p. 1.) The petitioner argues that the federal standard for actual innocence claims in habeas cases, as set forth by the Supreme Court of the United States in Murray v. Carrier, 477 U.S. 478, 496,106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) and Schlup v. Delo, 513 U.S. 298,115 S.Ct. 851, 130 L.Ed.2d 808 (1995), should be adopted in Connecticut. For the reasons set forth below, this court declines the petitioner's request to adopt the federal standard.
As explained in section III, supra, the Supreme Court of Connecticut has established the standard by which freestanding actual innocence claims are evaluated in habeas corpus proceedings. Miller v. Commissioner, supra, 242 Conn. 745;Summerville v. Warden, supra, 229 Conn. 397. In the federal courts, there are two types of actual innocence claims that habeas petitioners may assert: gateway and freestanding. SeeMurray v. Carrier, supra, 477 U.S. 478 and Schlup v. Delo, supra,513 U.S. 298. In gateway claims, the petitioner argues that "the claim is asserted in conjunction with, or supplemental to, a constitutional claim." (Pet. Brief, p. 78.) Freestanding claims of actual innocence, however, are independent claims "where no constitutional violation is claimed." Id. Connecticut courts, however, have only recognized freestanding claims of actual innocence. Miller v. Commissioner, supra, 242 Conn. 745;Summerville v. Warden, supra, 229 Conn. 397. The petitioner makes a gateway claim. (Pet. Brief, p. 78.) Underlying both the federal and Connecticut standards, is the "fundamental miscarriage of justice" exception established in Murray v. Carrier, supra,477 U.S. 478. CT Page 16791
The petitioner argues that Connecticut courts have implied that gateway claims are permissible in Connecticut state habeas proceedings. (Pet. Brief, pp. 84-88.) Based on this premise, the petitioner asks this court to recognize his claim as a gateway claim of actual innocence, and adopt the "new reliable" evidence standard of Schlup v. Delo, supra, 513 U.S. 298. The petitioner claims that because of his trial attorney's incompetence, certain evidence that existed at the time of trial was not presented to the jury. This evidence, the petitioner claims, is newly reliable in that it points to the petitioner's actual innocence.
Even if this court were to agree with the petitioner and adopt the federal gateway standard as established in Schlup andCarrier, it is clear that the petitioner's claim of actual innocence must still fail because of the petitioner's failure to sustain his burden of proof on his claim of ineffective assistance of trial counsel.
Furthermore, the petitioner's arguments regarding his actual innocence are based on the following faulty premise: "That the jury found Mr. Rivera guilty, in large part, must be attributed to the overwhelming nature of the physical evidence in the state's case." The state's case at trial was built largely on testimonial evidence, not physical evidence. This fact is amplified by the petitioner's extensive focus on critiquing Mautino's testimony. The petitioner has argued, on the one hand, that Mautino's inconsistencies are particularly important because the state's case was based largely on Mautino's testimony. On the other hand, the petitioner argues that it was the physical evidence that resulted in Rivera's conviction. The petitioner cannot have it both ways. Because this court finds that the petitioner's arguments regarding his actual innocence claim are built on a faulty premise, the arguments must fail.
Moreover, it cannot be said that had Mautino's inconsistent statements been presented to the jury, "no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt."Schlup v. Delo, supra 513 U.S. 327. Although the inconsistent statements might have raised doubts, especially about the location of the shooting on Francis Avenue, the petitioner has not met his burden of showing "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence . . . ." (Emphasis added.) Id. The "newly reliable" evidence as produced by the petitioner is minor and CT Page 16792 inconsequential. Simply put, the evidence adduced at the habeas hearing and the original trial is not sufficient to show a reasonable probability that the jury would have decided the case differently.
For all of the foregoing reasons the petition is dismissed.
Zarella, J.